In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 25-2532

BECKY SPENGLER,

*Plaintiff-Appellant*,

*v.*

COOPERATIVE EDUCATIONAL SERVICE AGENCY 7, also known
as CESA 7, *et al.*,

*Defendants-Appellees*.

---

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:22-cv-01199-WCG — **William C. Griesbach**, *Judge.*

---

ARGUED MAY 20, 2026 — DECIDED JULY 8, 2026

---

Before BRENNAN, *Chief Judge*, and SCUDDER, and JACKSON-AKIWUMI, *Circuit Judges*.

SCUDDER, *Circuit Judge*. In 2018, Becky Spengler started working as a special education administrator in Wisconsin. A couple years into the role, her supervisors pushed her and the rest of her team to adopt an "equity mindset," which required everyone to interrogate their implicit racial biases and privileges. Spengler understood the demand differently.

She thought she had to believe that all white people—and only white people—are naturally racist. Spengler refused to adopt the equity mindset, and as a result, her employer demoted her to a different job.

Spengler contends that her supervisors violated Title VII and the Fourteenth Amendment's Equal Protection Clause by discriminating against her because she was white and then retaliating against her for opposing that discrimination. But she presents no evidence that her race caused her demotion. Indeed, she even acknowledges that her employer likely would have demoted an employee of color for rejecting the equity mindset too. We therefore affirm the district court's entry of summary judgment for the defendants on these claims.

Spengler separately alleges that her employer violated the First Amendment by retaliating against her for what she believes and what she declines to believe. The district court never considered this claim, determining that Spengler insufficiently pleaded it. On this point, we disagree and remand for further proceedings.

## I

## A

In 2018, Cooperative Educational Service Agency 7 hired Spengler as an Integration Director. CESAs are statutorily created state agencies "designed to serve educational needs in all areas of Wisconsin by serving as a link both between school districts and between school districts and the state." Wis. Stat. § 116.01. They "facilitate communication and cooperation among all public, private, and tribal schools, and all public and private agencies and organizations, that provide services to pupils." *Id.*

CESA 7 hired Spengler to effectuate a contract with the Wisconsin Department of Public Instruction, or DPI, as the parties prefer to call it. Under that contract, DPI provided CESA 7 funding in exchange for work advancing educational initiatives. In her role as Integration Director, Spengler trained and supported the special-education directors for the 38 school districts within CESA 7. She also worked as a coach who provided professional learning to help teachers and staff implement training and particular workplace practices. *Coaching*, Wis. Dep't of Pub. Instruction, https://dpi.wi.gov/coaching (last visited June 22, 2026). All ten of Spengler's fellow coaches were white.

Spengler claims that after a couple years, DPI began focusing on race by requiring coaches to adopt an "equity mindset." According to DPI's Coaching Competency Practice Profile, a coach with an equity mindset "cultivates … the willingness and ability to see and speak to how their power and privilege are at work to systematically advantage some while simultaneously disadvantag[ing] others," helps others understand "how their thoughts and actions may negatively impact marginalized … communities," and "surfaces the impact of white supremacy and the history of whiteness on systems" while working "to disrupt and dismantle its effects."

Spengler thought the push for coaches to have an equity mindset was itself racist and discriminatory against white people. As she saw it, DPI's worldview anchored itself in a belief that "the natural state of White people—unlike people of color—is to be racists." When she voiced her disagreement with this perspective, tension emerged among Spengler and her co-workers.

Over time, DPI officials requested that CESA 7 replace Spengler as Integration Director for the 2022-2023 contract year. First, in September 2021, Julia Hartwig, DPI's Director of Special Education, requested a meeting with Jeff Dickert, CESA 7's Agency Administrator, to discuss concerns about Spengler. Later, in October 2021, Hartwig emailed Dickert to share that DPI's "strong preference [was] that Becky [Spengler] no longer be assigned" to the projects governed by the contract. Finally, in February 2022, Hartwig and another DPI official named Lynn Winn indicated to Dickert that they did not want Spengler to continue in her role.

DPI's pressure appears to have worked. In May 2022, Dickert met with DPI representatives and realized that CESA 7 would lose funding if Spengler continued as Integration Director. Colleen Timm, CESA 7's Learning Services Director, informed Spengler that DPI viewed "points in the [new] [c]ontract" as non-negotiable and that she could keep her position as the Integration Director only if she "could commit to the role without pushback or questioning." Spengler claims that one of those points required CESA 7 staff to have "a demonstrated commitment to examining their personal biases in the areas of race and ability, and to dismantling racist and ableist educational systems."

Spengler declined to make that commitment. She promised in correspondence with Dickert and Timm "to effectively carry out DPI's direction with regard to … [her] work within the Districts." But she was unwilling to "agree to keep silent regarding DPI's racist philosophy, policies, and plan of action." Indeed, she maintained that she had the "right to express" her "personal views and opinions regarding matters of race" and to "express those views in the same respectful man-

ner as any other employee of DPI and/or CESA 7 might express their views." She also "retain[ed] [her] right to continue to oppose racial discrimination in the workplace."

In June 2022, CESA 7 declined to re-up Spengler as the Integration Director and instead employed her in a different position that paid much less.

B

Spengler sued CESA 7 and DPI in federal court. She alleged that CESA 7 and DPI violated Title VII by discriminating against her because of her race and by retaliating against her for opposing their discrimination. She also claimed that CESA 7's alleged discrimination violated the Equal Protection Clause. Finally, she alleged that CESA 7 violated her First Amendment rights by retaliating against her because of her speech and beliefs, or as she put it in her summary judgment briefing, because of (1) "her political beliefs," (2) "what she said," (3) "what she declined to say," (4) "what she believed," and (5) "what she declined to believe."

The district court entered summary judgment for the defendants. As to the claims of racial discrimination, it reasoned that the defendants demoted Spengler due to her objections to their "opinion or ideology," not because of her race. Unable to prove discrimination, her Title VII retaliation claim necessarily failed.

As to the First Amendment claims, the district court analyzed them one at a time. Starting with the claim that CESA 7 retaliated against Spengler because of what she said and what she declined to say, it concluded that none of her statements were constitutionally protected (because she made them pursuant to her official duties) and that she never had to say an-

ything against her will. Turning to the claim that CESA 7 retaliated against Spengler because of what she believed and what she declined to believe, it determined that she did not sufficiently plead the claim. So the district court declined to consider it.

Spengler now appeals.

## II

### A

We start with Spengler's racial discrimination claims. She contends that CESA 7 and DPI discriminated against her because of her race, in violation of Title VII. She also alleges that CESA 7's discrimination violated the Equal Protection Clause. "We analyze the substance of Title VII and equal protection claims brought under 42 U.S.C. § 1983 in the same way." *Paterakos v. City of Chicago*, 147 F.4th 787, 795 (7th Cir. 2025). So we address these claims together.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). An employer is liable if an employee's protected trait was a but-for cause or a "motivating factor" in its challenged employment practice. *Bostock v. Clayton County*, 590 U.S. 644, 656–57 (2020) (quoting 42 U.S.C. § 2000e-2(m)). At summary judgment, courts ask "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the … adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

B

No reasonable jury could conclude that Spengler's race caused her demotion. Starting with but-for causation, Spengler admits that the defendants would have likely removed a black employee from the same role if the employee refused to agree with DPI on matters of race. And turning to the motivating-factor test, Spengler presents no evidence that her race "was one of the reasons that the employer took adverse action against her." *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007). She even acknowledges that all of the coaches on her project were white and that CESA 7 ultimately replaced her with a white woman to complete her duties with DPI.

Spengler responds by doubling down on but-for causation. She contends that the defendants' ideological demands asked more of white employees than employees of color. In her view, DPI taught that "the natural state of White people—unlike people of color—is to be racists." On this view, the defendants demoted Spengler because she, as a white person, was unwilling to agree that she was born racist, while they would have allowed an employee of color to deny that they were born racist. See *Bostock*, 590 U.S. at 656 ("[A] but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.").

But Spengler offers no evidence from which a reasonable jury could conclude that the defendants compelled her to embrace this view. Much of her evidence, like DPI's Coaching Competency Practice Profile, merely demands that coaches of all races recognize their implicit biases and resist white supremacy. And her other evidence falls short too. She points to DPI's definitions of "White Supremacy" and "Whiteness,"

but neither states that all white people are naturally and necessarily racist. DPI also published an article in which a white author claims that "those of us of the dominant race or culture need to work especially hard to examine power, privilege and bias." But that comment does not suggest that all white people are born racist.

Spengler also identifies various articles written by third parties that DPI circulated to the coaches. But she provides no reason to believe that the defendants demanded that she assent to the content of those articles to keep her position as Integration Director. To be sure, it appears that Spengler had to adopt an "equity mindset." But DPI's Coaching Competency Practice Profile describes the "equity mindset" as applying to coaches of all races without ever suggesting that all white people are uniquely racist. Spengler also claims that the new contract terms required CESA 7's staff to have "a demonstrated commitment to examining their personal biases in the areas of race and ability, and to dismantling racist and ableist educational systems." This condition, too, applies to coaches of all races. Even more, the contract says nothing about agreeing with third-party articles. In short, we see no evidence that a condition of Spengler's employment was to believe that all white people—and only white people—are naturally racist.

C

That brings us to Spengler's Title VII retaliation claim. To survive summary judgment, she had to offer evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Logan v. City of Chicago*, 4 F.4th 529, 538 (7th Cir. 2021) (cleaned up). "For the first element—a statutorily protected activity—'[t]he plaintiff must not only have a subjec-

tive (sincere, good faith) belief that he opposed an unlawful practice; his belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII.'" *Id.* (quoting *Scheidler v. Indiana*, 914 F.3d 535, 542 (7th Cir. 2019)). For the reasons already discussed, we see no objectively reasonable basis for believing the defendants discriminated against Spengler because of her race. So she cannot satisfy the first element of Title VII retaliation.

## III

### A

Moving to Spengler's First Amendment claims, she does not appeal the district court's entry of summary judgment for CESA 7 on her claim that it retaliated against her because of what she said and what she declined to say. But she does appeal the district court's failure to address her claim that CESA 7 retaliated against her because of what she believes and what she declines to believe. We will therefore address only the latter claim.

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment" as that would not provide "the fair notice required." *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (cleaned up).

B

The district court should have considered Spengler's claim that CESA 7 retaliated against her because of her beliefs. As a matter of law, we have no doubt that her claim is cognizable. The First Amendment "protects a public employee from discharge … based on what he believes." *Branti v. Finkel*, 445 U.S. 507, 515 (1980). That protection guards against more than just retaliation for "political affiliation." *Heideman v. Wirsing*, 7 F.3d 659, 661–62 (7th Cir. 1993). It also extends to any attempt to force public employees to "conform their beliefs … to some state-selected orthodoxy." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990). "[U]nless the government can demonstrate an overriding interest of vital importance requiring that a person's private beliefs conform to those of the hiring authority, his beliefs cannot be the sole basis for depriving him of continued public employment." *Branti*, 445 U.S. at 515–16 (cleaned up).

We are also confident that Spengler's operative complaint provided CESA 7 with "fair notice" that she was bringing this claim. *Twombly*, 550 U.S. at 555 (cleaned up). Most directly, she alleges that "[d]espite her positive job performance and track record," CESA 7 "repeatedly informed [her] that she could not properly perform the Director of Integrated Services job unless she believed and otherwise agreed with and embraced DPI's racist philosophy, programs, and actions," even saying this demand "violated [her] constitutional rights." Second Am. Compl. ¶ 41.b.

And more broadly, as the district court recognized, the overarching thrust of Spengler's complaint is that she lost her job as CESA 7's Integration Director "because she did not share DPI's views" on race. She emphasizes that CESA 7

never "complain[ed] about the work she performed" or "otherwise legitimately assert[ed] that [she] had failed to provide all agreed-upon 'deliverables.'" Second Am. Compl. ¶ 26. Yet she alleges that CESA 7 warned her that "if she remained in the Director of Integrated Services role, she would need to fully embrace DPI's racist philosophy, actions and agenda, and that she could no longer question or voice disagreement with DPI's racist assumptions, philosophy, actions and agenda." *Id.* ¶ 37.e. Put even more directly, the complaint states that "[b]ecause [Spengler] declined to accept DPI's beliefs and to 'demonstrate' that she embraced and agreed with DPI's racist philosophy, beliefs, actions, and agenda, [CESA 7] removed her from her role as Director of Integrated Services," *id.* ¶ 37.g, in violation of her "constitutional rights," *id.* ¶ 37.h. CESA 7 had fair notice of Spengler's claim that it retaliated against her because of her beliefs. Rule 8(a) required no more.

* * *

For these reasons, we AFFIRM the district court's grant of summary judgment on the Title VII and equal protection claims and REMAND the case for further consideration of the claim that CESA 7 violated the First Amendment by retaliating against Spengler because of what she believes and what she declines to believe.